## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

TED LaFLECHE, an individual,

        Plaintiff,


v.                         **MEMORANDUM OF LAW & ORDER**
                                   Civil File No. 05-2549 (MJD/AJB)


CLARK PRODUCTS, INC., an
Illinois corporation,

        Defendant.

_____

Sean A. Shiff, Skolnick & Shiff, P.A., Counsel for Plaintiff.

David T. B. Audley, James P. Sullivan, and Mark A. Partin, Chapman & Cutler, LLP, and Matthew T. Boos, Theresa M. Weber, and Jennifer A. Kitchak, Fredrikson & Byron, PA, Counsel for Defendant.

_____

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary

Judgment.  [Docket No. 28]  The Court heard oral argument on April 20, 2007.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Defendant Clark Products, Inc. ("Clark"), is a distributor of packaging,

janitor, and food service supplies.  Flesch's Paper Services, Inc. ("Flesch's") was a

paper products supply distributor that primarily serviced restaurants in the Twin

Cities area.  It was owned by Plaintiff Ted LaFleche.  Flesch's did not have

contracts with its customers; they were on a sale-to-sale arrangement with

Flesch's.

In 2001, LaFleche decided to sell Flesch's due to issues with its lease and

rising health care costs.  At the time, it was making only a small profit or no profit.

However, LaFleche avers that Flesch's had a stable, long-standing customer base,

after having been in business for 64 years.  He claims that its customer base was

steadily increasing, as was the volume of its gross profits.  By 2001, it had

approximately 600 customers.

### 2.    Negotiations for the Sale of Flesch's

In April 2001, LaFleche met with Dick Garland, Clark's Twin Cities Division

President, to discuss the possible sale of Flesch's to Clark.  Garland died in 2003.

Garland made an initial offer of $100,000 to purchase Flesch's with an

additional $250,000 to be paid out over a five-year period.  LaFleche believed

Flesch's was worth more money because its sales were very consistent.

LaFleche counter-offered with a total sales price of $450,000 with $100,000

down and the remaining $350,000 guaranteed over five years.  Garland

responded with an offer including an earn-out where LaFleche would receive

$100,000 down and then possible earn-out payments over the next five years,

based on the gross profits of new customers brought to Clark by former Flesch's salespeople. LaFleche concluded that his customers would come to Clark, so he decided that an earn-out would result in him making more money that the original Clark proposal.

An earn-out is a premium paid to the seller over the book value of the seller's business assets; however, the premium is not guaranteed and may not be realized. If the seller's customers do not transfer to and stay with Clark, then the seller may not qualify for the earn-out. Clark frequently employs earn-outs when purchasing a business that is not making a profit but the seller believes that he should receive more than the bare value of the assets of the business.

Before the sale, LaFleche conducted an inspection of the Clark facility, including the office and warehouse. He did not ask to see any of Clark's financial documents or talk to any of Clark's employees. Before the sale was consummated, Garland informed LaFleche that Clark had problems in the past but that they had remedied most of them and "were on the right track."

In his affidavit and brief, LaFleche claims that Garland made seven actionable pre-sale representations:

1.   That Clark had a good computer system which could adequately process Flesch's account information and pricing;

2.   That Clark was going to provide one computer for each salesperson;

3.      That Clark was going to pre-load Flesch's customers' product and pricing data into Clark's computer system before the transition;

4.      That Clark would provide adequate customer service support, including one full-time person for Kelly McGivern (because he had such a large volume of customers) and the other salespeople would share a full-time customer service support person at the ratio of two-to-one;

5.      That Clark had adequate physical space at its warehouse for the products distributed by Flesch's;

6.      That Clark was going to move to a new, state-of-the-art warehouse facility in the fall of 2001 or spring of 2002, commenting that the move was an investment by Clark to improve its image, to enhance efficiencies, boost employee morale, and enable Clark to draw from a better pool of employees; and

7.      That Clark had greater buying power than Flesch's and therefore LaFleche and his sales people would be able to offer their customers cheaper prices, thus making them even more competitive.

LaFleche's affidavit does not state to whom Garland made these representations, although LaFleche claims that he relied on these representations when entering into the agreement with Clark because these factors would impact sales and gross profits and, therefore, directly affect the earn-out payments to LaFleche.  LaFleche also cites to the deposition testimony of former Flesch's and Clark salesman, Kelly McGivern, regarding these statements.  However, McGivern testified that Garland made the statements at a Flesch's meeting, which occurred after the sale had been agreed to, or even later, when McGivern was negotiating

4

directly with Garland regarding whether McGivern would agree to sign a non-compete agreement and become a Clark salesman.

### 3.     Asset Purchase Agreement

On September 7, 2001, LaFleche and Clark entered into an Asset Purchase Agreement ("APA") that stated that LaFleche would receive $100,000 at closing and "a certain sum of money each subsequent one year anniversary of the date of Closing for a period of five (5) consecutive years . . .   The Payments shall not be guaranteed."  (APA ¶ 3.)  The subsequent yearly payments were to be calculated by Clark from the Adjusted Gross Profits from the sales accounts brought to or added to Clark by Flesch's salespersons, who, along with LaFleche, became employees of Clark in connection with the APA.  (Id.)  These earn-out payments could vary from $0 to $150,000, depending on the adjusted gross profits.  (APA, Schedule II.)

The earn-out provision was structured so that any payments Clark made to LaFleche would be paid for by the gross profits coming to Clark.  Thus, Clark had an incentive to pay the earn-out because it would only pay the earn-out if Flesch's business had transferred to Clark and increased Clark's gross profits.

The APA did not contain any express representation or obligation on behalf of Clark other than the sales price, timing, the purchase of Flesch's assets, the earn-out schedule, and the four warranties listed in Paragraph 13, which are

unrelated to the current lawsuit.

LaFleche avers that Clark and LaFleche understood that Clark would order, warehouse, and deliver the product, invoice the customers, and handle customer service, while LaFleche and the Flesch's sales representatives would handle the sales.

### 4.     Actions After the Sale Regarding Pre-sale Representations

### a.     Computer System

LaFleche avers that, within a week after the sale, Garland admitted to LaFleche that Clark's computer system needed to be replaced and that others at Clark had complained that the system was slow, outdated, and needed to be replaced.  He also claims that, shortly after the sale, Garland admitted that Clark could not provide one computer per salesperson because Clark lacked the ability to connect them to Clark's computer system because there were a limited number of ports.  Instead, six or seven sales employees had to share one computer terminal, causing inefficiencies and delays.  Eventually, Clark provided laptops to LaFleche and McGivern that did not have access to the most current data on Clark's system and could not immediately update the system with changes.

LaFleche avers that Clark's inefficient computer system made it difficult to determine if Clark carried or had in stock products for Flesch's customers, so Clark

could not properly maintain customers' accounts.

### b.    Pre-loading of Flesch's Information

LaFleche also avers in his affidavit that Clark did not pre-load customers' product and pricing data.  Instead, Clark loaded the information on an ad hoc basis, which took large amounts of time and caused incorrect product delivery and pricing.

LaFleche did testify that Clark pre-loaded Flesch's customer contact and inventory data and that the pricing data was loaded within months of the execution of the APA.

### c.    Pricing

LaFleche claims that, after the sale, he discovered that Clark's prices on products offered to Flesch's customers were not better than Flesch's prices. McGivern discovered that Flesch's prices were better than Clark's on seventy-five percent of the products.  McGivern did admit that if one compared manufacture price to manufacture price, Clark's pricing probably was better.

### d.    Warehouse

LaFleche asserts that Clark did not have adequate physical space in its warehouse for Flesch's products.  However, it did not move into a new warehouse until September 2004.  After the sale, Garland explained to LaFleche that Clark's corporate office would not approve of a move to a new facility until after the

division was profitable, but the division had not been profitable for several years.

According to LaFleche, when he saw Clark's warehouse before the sale, it was clean and organized, but, after Flesch's inventory was added, the warehouse was in disarray. LaFleche had to spend one to three hours per day looking for products. Products were damaged because employees had to climb over them to reach other products and customers sometimes received damaged products.

### e.    Customer Service Support

LaFleche avers that Clark failed to provide adequate customer service support. It did not provide McGivern with a full-time customer service staff member. This caused salespeople to spend considerable time dealing with customer complaints.

LaFleche also asserts that Clark's delivery service was poor because some of its drivers were temporary or third-party general delivery services who were untrained and unfamiliar with Flesch's customers or products. Drivers were rude, attempted to pick fights with customers, and would sometimes drop the product off outside the restaurant.

### f.    Overall Clark Performance

During the first year after the sale, one-half of the orders that went out to Flesch's customers had some type of error; customers frequently called to complain. Flesch's salespeople spent from 30% to 50% of their time addressing

8

the complaints.  Flesch's salespeople told Donald Hindman, President of Clark, about the problems with Clark's service.  Because of Clark's problems, LaFleche and other Flesch's salespeople lost a majority of their business.  McGivern, who had the largest customer base at Flesch's, lost 60% of his business after the sale, partly due to delivery and invoicing problems.  In response, McGivern left Clark in March 2002 and went to work for a competitor, taking many of his remaining customers with him.

LaFleche avers that if Clark's pre-sale representations had been true, the Flesch's customers who left Clark would likely have remained customers because Flesch's salespeople had good relationships with them and Clark's buying power should have enabled the salespeople to bring in even more business.  Clark's management admitted that its distribution problems contributed to a considerable loss of business, which led to a shortfall in LaFleche meeting the gross profit threshold for payments under the parties' agreement.

LaFleche originally testified that he had no proof that Garland lied or deliberately tried to mislead him.  He admitted that Garland spent extra time including nights and weekends working to resolve issues with the warehouse.  LaFleche later submitted a written correction to his deposition testimony alleging that Garland made some of the representations that form the basis for LaFleche's claim and that "Garland knew or should have known that his representations were

9

not true and that his promises would and could not be honored by Clark."

### 5.    New Earn-Out Schedule

In 2003, John Beckman became the Division President of the Twin Cities Division and gave LaFleche new accounts to call on.  However, LaFleche did not generate gross profits sufficient to earn payment under the APA.

In Spring 2003, LaFleche met with Hindman and Chris Orbaugh, Clark's Regional Vice President, to discuss issues regarding the sale of Flesch's to Clark. LaFleche provided them a list of accounts that he had lost and what their dollar volume would have been.  LaFleche asked that the earn-out schedule be changed by the amount of money that he believed he had lost due to customers leaving Clark.  Orbaugh offered LaFleche a lump sum payment of $20,000 and a new earn-out schedule.  LaFleche accepted the check for $20,000 on or about May 16, 2003.  He then cashed the $20,000 check.  According to Orbaugh, LaFleche also accepted the new payment grid.  After that time, Clark did not receive any further complaints from LaFleche regarding Clark's warehouse, deliveries, or operations.

LaFleche contends that he never accepted the proposed new schedule and that he did not deposit the $20,000 check with the understanding that it was in satisfaction of his claims against Clark.  Hindman testified that the $20,000 was not to compensate LaFleche under the earn-out schedule; rather it was a token gesture to "appease" him and to "try and be good guys."  (Hindman Dep. 112.)

**B.      Procedural Background**

LaFleche filed a lawsuit against Clark in Hennepin County District Court on October 10, 2005. Defendant removed the case to this Court based on diversity of citizenship on November 1, 2005.

In his Complaint, LaFleche alleges Count One: Breach of Contract, Count Two: Breach of Covenant of Good Faith and Fair Dealing, and Count Three: Intentional Misrepresentation. Clark now brings this motion for summary judgment on all counts.

**III.    DISCUSSION**

**A.      Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

**B.      Admissibility of LaFleche Affidavit and Errata Sheet**

Clark asserts that the Court should not consider LaFleche's affidavit because

it is inadmissible and is contradictory to his deposition testimony.  Defendant also asserts that most of LaFleche's affidavit is not based on personal knowledge, but is, instead, hearsay, lacking in foundation.

When deciding a motion for summary judgment, a court can only consider admissible evidence.  Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004).  The Court should "disregard portions of . . . affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact."  Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 801 (8th Cir. 2004) (citations omitted).

Most of the portions of LaFleche's affidavit cited by Clark are the type of attempted clarifications to be resolved by a jury.  The Court will not strike LaFleche's affidavit.  The main issue with LaFleche's affidavit is that he never states that Garland's statements were made to him or communicated to him. (LaFleche Aff. ¶ 21.)  If LaFleche can provide no admissible evidence that Garland, or someone else at Clark, made those representations before the sale and they were communicated to LaFleche before the sale, then his misrepresentation claims must fail because he could not have relied on them in entering into the APA.  The Court will keep this evidence in mind when deciding Clark's motion for summary judgment.

Clark also objects to LaFleche's submission of an errata sheet.  In LaFleche's

12

deposition, when asked what proof he had that, when Garland made the alleged representations, he had no intention of performing the representations, LaFleche answered: "I don't have any proof that he – that he had lied or had deliberately tried to mislead me."  (LaFleche Dep. 64.)  In the errata sheet, LaFleche states that, before the sale, Garland represented that Clark had a good computer system, that Flesch's customer inventory and pricing data would be preloaded, and that Clark would move to a state-of-the-art facility in fall 2001 or spring 2002.  He states that Clark failed to perform these promises and that "Garland knew or should have known that his representations were not true and that his promises would and could not be honored by Clark."

The Eighth Circuit has noted, "If testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.  A party should not be allowed to create issues of credibility by contradicting his own earlier testimony."  Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983).  "The district courts should examine such issues with extreme care, and only in circumstances . . . where the conflicts between the deposition and affidavit raise only sham issues should summary judgment be granted."  Id. at 1366.  Thus, "when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record."  City of St. Joseph,

13

<u>Mo. v. Sw. Bell Tele.</u>, 439 F.3d 468, 476 (8th Cir. 2006) (citation omitted).

Although LaFleche's "correction" of his deposition testimony is extensive and goes beyond the normal correction of a small misstatement, his errata sheet testimony does not directly contradict his deposition testimony.  The Court will permit both the deposition testimony and the errata sheet to remain in evidence.

### C.    Choice of Law

The APA contains a choice of law provision stating: "The internal law, not the law of conflicts, of the State of Illinois shall govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement."  (APA ¶ 22.)

A court sitting in diversity applies the choice of law requirements of the forum state, and "Minnesota generally recognizes choice of law clauses."  <u>Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.</u>, 111 F.3d 1386, 1392-93 (8th Cir. 1997) (citation omitted).  Even a narrow choice of law provision, stating that the contract "shall be deemed entered into within and shall be governed by and interpreted in accordance with the laws of" a particular state, can govern tort claims arising out of the parties' performance under the contract or closely related to the interpretation of the contract, including claims of fraud in the inducement or misrepresentation.  <u>Id.</u> at 1392-93.

The choice of law provision in the APA is broader than the provision in

14

<u>Astraea</u>.  Both the breach of contract claim and the claim for breach of good faith and fair dealing are premised on the APA.  Illinois law applies to those claims. Both parties apply Minnesota law to Count Three, so they do not seek to enforce and apply the choice-of-law provision to the misrepresentation claim.  The Court, too, will apply Minnesota law to Count Three.  However, the Court's analysis of Count Three would be the same under Illinois law.

### D.   Breach of Contract

#### 1.   Elements of Breach of Contract Claim

Under Illinois law,

> [i]n order to state a cause of action for breach of contract, a plaintiff must establish: (1) an offer and acceptance; (2) consideration; (3) definite and certain terms of the contract; (4) plaintiff's performance of all required contractual conditions; (5) defendants' breach of the terms of the contract; and (6) damage resulting from the breach.

<u>Barille v. Sears Roebuck & Co.</u>, 682 N.E.2d 118, 121 (Ill. Ct. App. 1997) (citation omitted).

#### 2.   Merits of the Claim

LaFleche asserts that Clark breached the APA in seven ways; he alleges Clark agreed to

1.   Handle the ordering, warehousing, and delivery of products to customers,

2.   Invoice the customers,

3.   Handle customer service for the customers,

15

    4.      Provide one computer for each sales person,

    5.      Pre-load the Flesch's customers' product and pricing data before the transition,

    6.      Have adequate customer service support, including one full-time person for McGivern, and

    7.      Move to a new state-of-the-art facility in the fall of 2001 or spring of 2002.

However, LaFleche admits that these specific promises were not contained in the APA.

LaFleche makes no allegation that the APA was not a fully integrated contract. Moreover, the APA "makes no mention of any outside proposal nor does it contain any references whatsoever to any additional discussions." <u>Eichengreen v. Rollins, Inc.</u>, 757 N.E.2d 952, 958 (Ill. Ct. App. 2001). The APA lists the particular assets to be sold and the parameters of that agreement. "[T]he written contract here, on its face, constituted a final and complete integration of the parties' agreement." <u>Id.</u> Thus, "extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated writing. [Additionally] [a] party may not introduce parol or extrinsic evidence to show additional consistent terms of a contract unless the writing is incomplete or ambiguous." <u>Id.</u> at 956 (citations omitted).

The Court cannot read new terms into the contract. <u>See</u> <u>Resolution Trust Corp. v. Holtzman</u>, 618 N.E.2d 418, 423 (Ill. Ct. App. 1993) ("The rules of contract

provide that the parties to a contract are presumed to have intended what their language clearly imports so that a trial court has no discretion to require parties to accept any terms other than those in their contract.") (citation omitted).  None of the terms LaFleche alleges are explicitly contained in the APA.  LaFleche does not allege that Clark breached any specific portion of the APA.  Thus, LaFleche's breach of contract claim, Count One, cannot survive unless the listed obligations are somehow implied in the APA.

In Count Two, LaFleche claims that the certain promises were implied by the covenant of good faith and fair dealing.  Therefore, the Court will also analyze his breach of contract claim under the duty of good faith and fair dealing.

LaFleche also claims that Clark's conduct frustrated his ability to receive earn-out payments under the APA.  Clark responds that the doctrine of commercial frustration is a defense to a breach of contract claim, not an affirmative cause of action.  Smith v. Roberts, 370 N.E.2d 271, 273 (Ill. Ct. App. 1977).  It is applied to "render a contract unenforceable if a party's performance under the contract is rendered meaningless due to an unforeseen change in circumstances."  Ill.-Am. Water Co. v. City of Peoria, 774 N.E.2d 383, 390-91 (Ill Ct. App. 2002) (citation omitted).  Clark argues that, in this case, LaFleche's ability to receive earn-out payments was not contingent upon Clark's performance of the actions LaFleche claims Clark failed to perform.  The Court interprets LaFleche's

17

allegation to not be an assertion of the defense of frustration, but rather to be an

assertion that Clark breached its duty of good faith and fair dealing by performing

under the APA in such a way as to prevent LaFleche from earning the earn out.

### 3.   Breach of Contract Based on Covenant of Good Faith and Fair Dealing

"Illinois law does not recognize independent claims based on breaches of

any implied duties of good faith." Echo, Inc. v. Whitson Co., Inc., 121 F.3d 1099,

1105-06 (7th Cir. 1997). Thus, Count Two must be encompassed within Count

One, breach of contract. The Court dismisses Count Two because it cannot exist

as an independent count.

> Although every contract implies good faith and fair dealing,
> the duty of good faith and fair dealing is, as conceded by defendants,
> a derivative principle of contract law. While this obligation exists in
> every contract in Illinois, it is essentially used as a construction aid in
> determining the intent of the parties where an instrument is
> susceptible of two conflicting constructions.
>
> Generally, problems involving the duty of good faith and fair
> dealing arise where one party to a contract is given broad discretion
> in performance. The doctrine of good faith then requires the party
> vested with contractual discretion to exercise that discretion
> reasonably and with proper motive, not arbitrarily, capriciously, or in
> a manner inconsistent with the reasonable expectations of the
> parties.

Resolution Trust Corp., 618 N.E.2d at 424 (citations omitted). On the other hand,

"[p]arties are entitled to enforce the terms of negotiated contracts to the letter

without being mulcted for lack of good faith. Express covenants abrogate the

operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties." Id. (citation omitted).

"A court cannot remake a contract and give a litigant a better bargain than he himself was satisfied to make; and when the terms of a contract are clear and unambiguous, they must be enforced." Newcastle Props., Inc. v. Shalowitz, 582 N.E.2d 1165, 1168 (Ill. Ct. App. 1991) (citations omitted). Thus, the Court cannot read into the APA obligations that Clark insure no business is lost and guarantee that LaFleche gets paid the non-guaranteed earn-out.

Clark argues that it did not act in bad faith. It notes that LaFleche testified that he has no evidence that Garland lied or deliberately tried to mislead him. Additionally, Clark did pre-load Flesch's customer information and inventory data and moved to a new warehouse in 2004. LaFleche testified that Garland spent overtime working on nights and weekends trying to accommodate LaFleche's transition.

Clark also asserts that the allegation that Clark conspired to frustrate LaFleche's ability to achieve the non-guaranteed earn-out is nonsensical because if LaFleche earned an earn-out, Clark profited, so there was no reason for Clark to hinder him.

LaFleche asserts that Clark agreed to handle various aspects of the business operations such as stocking and delivering product, invoicing customers and

handling customer service issues.  He argues that although these obligations were not expressly stated in the APA, they are consistent with the APA and Clark agreed to perform them.  Also, he claims that these tasks were essential to the parties' relationship because the purpose of the APA was to bring over Flesch's customers and keep them.  LaFleche concludes that the spirit of the APA was to give him a fair opportunity to maximize the earn-out consideration available to him.  He notes that Clark controlled the customer service aspects of the relationship, so it bore the obligation to perform the aforementioned tasks competently.

Specifically, LaFleche alleges that Clark breached its obligation of good faith and fair dealing by

1. Failing to have a workable and efficient computer system,

2. Failing to provide one computer per sales person,

3. Failing to pre-load the necessary computer data,

4. Failing to provide adequate customer service support staff,

5. Failing to offer better pricing than Flesch,

6. Failing to timely move to a new facility,

7. Failing to have an organized warehouse where employees could locate and access products,

8. Failing to have properly trained drivers, and

9. Making errors such as missing product, delivering wrong types and

amounts of product, missing deliveries, and invoicing errors.

The Court concludes Clark's obligation to deliver, invoice, and provide customer service may be implied in the APA, as it is a general obligation necessary for LaFleche to attempt to maintain his Flesch's customers and earn the earn-out payments.  However, LaFleche's claims for breach of covenant of good faith and fair dealing must be based on breach of the contract – the APA.  The covenant of good faith and fair dealing cannot be used to create new contractual terms.  Thus, the Court concludes that a jury could conclude that Clark breached its contractual duty to pay LaFleche's earn-out payments under Paragraph Three of the APA by utterly failing to provide adequate customer service support staff, failing to have an organized warehouse where employees could locate and access products, failing to have properly trained drivers, or making errors such as missing product, delivering wrong types and amounts of product, missing deliveries, and invoicing errors.  These general, basic obligations can be implied in Clark's duty to exercise its discretionary control over customer service and delivery in a way that did not prevent LaFleche from earning the earn out.

On the other hand, LaFleche cannot use the covenant of good faith and fair dealing to create new, specific contract terms that he simply wished had been included in the APA.  For instance, there is no mention of any particular computer requirement in the APA, and for the Court to imply an obligation for Clark to not

21

only provide computers for the Flesch's salespeople but also to specifically provide

one computer per salesperson would be to impermissibly rewrite the APA in

LaFleche's favor.  The Court also concludes that it cannot create an obligation to

have any particular type of computer system or to pre-load any particular data

into the computer system.  Similarly, while it is reasonable to infer that, for

LaFleche to have any chance at earning the earn-out payments, Clark had to

provide a workable warehouse, there is no logical basis to further imply that Clark

was required to move to an entirely new warehouse by a specific date simply to

fulfill its obligation under Paragraph Three of the APA.  Finally, there is no

contract term in the APA mentioning any obligation on Clark's behalf to have any

particular pricing scheme.  An obligation to have prices lower than Flesch's is the

type of specific obligation that would need to be negotiated and spelled out in the

APA, not created by a Court.

        The Court concludes that LaFleche has failed to state a claim for breach of

contract based on 1. Failing to have a workable and efficient computer system, 2.

Failing to provide one computer per sales person, 3. Failing to pre-load the

necessary computer data, 5. Failing to offer better pricing than Flesch, or 6.

Failing to timely move to a new facility.   These obligations constitute more than

just a buyer's reasonable expectations based on the APA's general obligations.

These are specific, concrete obligations that have no clear connection to any of

22

Clark's obligations reflected in the express contract – the APA.  If Clark did make these promises to LaFleche before the APA was executed, then they may be the proper basis for a misrepresentation claim.  They are not the proper basis for a breach of contract claim.

### 4.    Waiver

#### a.    Waiver Allegations

Clark also asserts that LaFleche has waived his claim for breach of contract by entering into the new earn-out schedule.  "Waiver is the voluntary and intentional relinquishment of a known right inconsistent with an intent to enforce that right."  R & B Kapital Dev., LLC v. N. Shore Cmty. Bank & Trust Co., 832 N.E.2d 246, 255 (Ill. Ct. App. 2005) (citation omitted).

Clark claims that LaFleche testified that the earn-out schedule found in the original APA would be incrementally reduced and he would be paid $20,000 to waive his claims regarding Clark's performance under the APA.  Although this is one interpretation of LaFleche's testimony, he did not explicitly so testify.  The parties have submitted conflicted evidence regarding whether the $20,000 payment and the new pay-out schedule were given in exchange for LaFleche's waiver of his claims against Clark.

Also, the May 16, 2003, memorandum setting forth the new pay-out schedule provided that the $20,000 was issued "[b]ased on these factors" of

"distribution problems incurred from the onset of the transition" and McGivern's departure, both leading "to a short fall in sales gross profit."  These statements imply that the money and new schedule were tied and were provided to compensate LaFleche for the loss of business due to Clark's distribution problems. However, the memorandum does not explicitly state that payment is a waiver of LaFleche's possible claims.  In light of the absence of an express waiver statement, LaFleche's testimony, and the ambiguity of the May 16, 2003 memorandum, it is appropriate for a jury to determine if LaFleche waived his claims.

### b.    Waiver of Affirmative Defenses

LaFleche asserts that Clark has waived its right to assert the affirmative defense of waiver because it did not plead that defense in its answer.  See Fed. R. Civ. P. 8(c)  ("[A] party shall set forth affirmatively . . . waiver . . .").

The Eighth Circuit is flexible regarding the failure to plead an affirmative defense:

> Generally, failure to plead an affirmative defense results in a waiver
> of that defense.  The Supreme Court has indicated that the Rule 8(c)
> pleading requirement is intended to give the opposing party both
> notice of the affirmative defense and an opportunity to rebut it.  We
> have, therefore, eschewed a literal interpretation of the Rule that
> places form over substance, and instead have held that [w]hen an
> affirmative defense is raised in the trial court in a manner that does
> not result in unfair surprise, . . . technical failure to comply with Rule
> 8(c) is not fatal.

First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622 (8th

Cir. 2007) (citations omitted).  "Consequently, where the circumstances merit it, we have accepted and favorably cited affirmative defenses first raised at various stages of litigation."  Id. at 622 n.5 (citation omitted).  In deciding whether to permit a new affirmative defense at the summary judgment stage, the Court examines whether allowance of the defense would unfairly surprise or prejudice the opposing party.  Id. at 623.

In this case, there is no evidence that LaFleche has been unfairly surprised or prejudiced by Clark's waiver argument, particularly in light of the fact that the Court has found a genuine issue of material fact regarding the significance of the May 16, 2003 memorandum.  The Court concludes that Clark has not waived its waiver argument and may assert that affirmative defense at trial.

### c.    Accord and Satisfaction

Although Clark does not assert accord and satisfaction, LaFleche also argues that Clark has waived the defense of accord and satisfaction.  This argument is moot because Clark has not asserted such a defense.

### E.    Intentional Misrepresentation

### 1.    Elements of Fraudulent Misrepresentation

In Court Three, LaFleche asserts fraudulent misrepresentation.  There is a "high threshold of proof for such a claim."  Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000).  LaFleche must have

pled with specificity that there was a false representation regarding a past or present fact, the fact was material and susceptible of knowledge, the representer knew it was false or asserted it as his or her own knowledge without knowing whether it was true or false, the representer intended to induce the claimant to act or justify the claimant in acting, the claimant was induced to act or justified in acting in reliance on the representation, the claimant suffered damages, and the representation was the proximate cause of the damages.

Where a representation regarding a future event is alleged . . . an additional element of proof is that the party making the representation had no intention of performing when the promise was made:

It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place. It is true that a misrepresentation of a present intention could amount to fraud. However, it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.

Id. (citations omitted). (The requirements are the same under Illinois law. See

Lillien v. Peak6 Invs., L.P., 417 F.3d 667, 671 (7th Cir. 2005); Connick v. Suzuki

Motor Co., Ltd., 675 N.E.2d 584, 591 (Ill. 1996).)

### 2.   Specific Misrepresentations

LaFleche asserts that eight broken promises constituted misrepresentation:

### 1.   That Clark would have a good computer system that would adequately process Flesch's account information and pricing

This misrepresentation is alleged in the Complaint, and LaFleche testified

that Garland made this representation before execution of the APA. Clark asserts

26

that this representation was merely Garland's general opinion and nothing more.

See Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000)

(noting that "neither opinions nor statements that are general and indefinite are

representations of fact") (citation omitted).

LaFleche asserts that after the sale, Garland admitted that Clark's computer

system needed to be replaced and that others at Clark had complained that the

computer system was slow, outdated, and needed to be replaced.  He argues that

the representation describing the computer system's capability of handling the

Flesch's account information was a then-present fact susceptible of knowledge.

He also claims that Garland's omission of material facts about the Clark computer

system constituted a misrepresentation by omission because Clark's computer

system was central to an efficient operation.

The Court concludes that the representation that Clark's system was good

and would adequately process Flesch's information is too indefinite and general to

form the basis for a valid claim for fraudulent misrepresentation.

## 2.    That Clark would pre-load Flesch's customer product and pricing data

This misrepresentation was pled in the Complaint, and LaFleche testified

that Garland made that representation to him.  Clark asserts that this promise was

actually performed by Clark and so was not a false representation and,

additionally, LaFleche admitted that Garland did not deliberately mislead him.

Clark also asserts that this statement is a promise to perform a future act, not an actionable statement of past or present fact.

LaFleche testified that Clark pre-loaded the customer contact and inventory data and that the pricing data was loaded within months after the transition. LaFleche admits that Clark loaded the pricing data on an ad hoc basis, but he asserts that this event was supposed to occur almost immediately after the representation was made, so it is reasonable to infer that Clark did not intend to pre-load the data at all. He also claims that it reasonable to infer that Clark lacked the manpower to perform this function, which was a then-present fact not disclosed to LaFleche.

This representation is regarding a future event. LaFleche admits that Clark did begin the process of loading the information in a timely manner but that it took months to complete. LaFleche's only evidence that Clark had no intention to perform on its promise at the time it was made is that the promise was not fulfilled in as timely a manner as was promised. This is not adequate to survive summary judgment. As the Minnesota Supreme Court explained, "It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Martens , 616 N.W.2d at 747.

**3.      That Clark would easily handle the new Flesch's business**

28

This misrepresentation was pled in the Compliant.  LaFleche also testified that Garland made this representation before the execution of the APA.

This representation is a promise to perform a future act, not a statement of past or present fact.  Additionally, this statement is a general opinion, which is not actionable.  A representation as to how easily Clark would handle Flesch's new business was not susceptible of knowledge or justifiably relied upon by LaFleche.  This representation is too general and indefinite to form the basis for a fraud claim.

### 4. That Clark would move to a new warehouse by the spring of 2002

This misrepresentation was pled in the Complaint.  Clark argues that this is a promise of future conduct, not a representation of past or present facts.  Also, this promise was performed in September 2004.

LaFleche claims that Clark represented that it planned to move to a new facility in the fall of 2001 or the spring of 2002, but that it did not actually move until the fall of 2004.  After the sale, Garland stated that Clark's corporate office would not approve of a move until the division was profitable; the division had not been profitable for several years; and the computer system and warehouse system made it difficult to achieve profitability.  LaFleche claims that Garland's failure to disclose this condition of moving or that the division had not been profitable for several years were omissions of material facts that rendered

misleading his representation regarding Clark's plan to move to a new facility much sooner.

The alleged representation that Clark would move warehouses by a specific date is a representation regarding a future event.  LaFleche testified that he had no proof that Garland lied or deliberately tried to mislead him.  In his "correction" to his deposition testimony, LaFleche attempted to expand on this answer by stating that, after the sale, Garland informed him of facts that would make it difficult for the division to move to a new warehouse by the spring of 2002. Although Garland's post-sale revelations may have made it less likely that the move could occur by the spring of 2002, it does not affirmatively appear that Clark had no intention to perform at the time the promise was made, particularly in light of LaFleche's own testimony that Garland did not lie or deliberately try to mislead LaFleche and the fact that Clark did, in fact, move to a new warehouse less than two years later.  The Court concludes that LaFleche cannot sustain a misrepresentation claim based on this representation.

5. **That Clark would provide one computer to each salesperson**

This misrepresentation was not alleged in the Complaint.  The failure to plead this misrepresentation is sufficient reason to dismiss LaFleche's claim to the extent it relies on this statement.

LaFleche claims that this promise is actionable, although it is a promise of future performance, because there is an inference that Garland knew it was false and had no intention of providing the computers when he made the representation.  LaFleche asserts that, shortly after the sale, Garland admitted that Clark could not add one computer per sales person because it lacked the ability to connect them to its computer system.  He also argues that Garland failed to disclose present facts which could have assisted LaFleche in determining the accuracy of the representation.

The Court holds that LaFleche cannot sustain a misrepresentation claim based on this representation.  This representation was not alleged in the Complaint, and there is no evidence that it was conveyed to LaFleche before he signed the APA.  Based on the evidence in the record, Garland only conveyed this representation to McGivern - and, furthermore, only did so after the sale was decided; thus, LaFleche could not have reasonably relied this representation in deciding whether to enter into the APA.

**6.     That Clark would provide adequate customer service**
          **support**

This misrepresentation was not specifically alleged in the Complaint, which constitutes sufficient ground for its dismissal.

LaFleche claims that Clark represented that it would provide adequate

31

customer service support, including a full-time staff member just for Kelly

McGivern.  He argues that because both Flesch's and Clark were in a business

where servicing customers is critical to keeping them, this was a material fact.  He

concludes that Clark failed to provide adequate customer service support and did

not provide a full-time person for McGivern.  He claims no one from Clark can

explain this failure.  He argues that the short time between Clark's representation

and its decision to not hire additional customer service support without any

explanation could lead a reasonable jury to conclude that Clark did not intend to

live up to its representation at the time that it was made.

The Court holds that LaFleche cannot sustain a misrepresentation claim

based on this representation.  This representation was not alleged in the

Complaint, and there is no evidence that it was conveyed to LaFleche before he

signed the APA.  Based on the evidence in the record, Garland only conveyed this

representation to McGivern - and, furthermore, only did so after the sale was

decided; thus, LaFleche could not have reasonably relied this representation in

deciding whether to enter into the APA.  Also, LaFleche cannot show that Clark

had no intention to perform the promise at the time it was made.

### 7.    That the warehouse would have adequate physical space

This misrepresentation was not pled in the Complaint, which constitutes

grounds for its dismissal.

32

LaFleche asserts that, in fact, the warehouse did not have adequate physical space, which created warehouse chaos and the inability to locate and access product.  He argues that this representation was of a then-present fact and is, therefore, actionable.

The Court holds that LaFleche cannot sustain a misrepresentation claim based on this representation.  This representation was not alleged in the Complaint, and there is no evidence that it was conveyed to LaFleche before he signed the APA; thus, LaFleche could not have reasonably relied this representation in deciding whether to enter into the APA.

### 8.    That Clark would have greater buying power and pricing than Flesch's

This misrepresentation was not pled in the Complaint, which constitutes grounds for its dismissal.

LaFleche claims that after the sale he discovered that Clark did not have better pricing than Flesch's.  He asserts that this was a false representation of a then-present fact.

The Court holds that LaFleche cannot sustain a misrepresentation claim based on this representation.  This representation was not alleged in the Complaint, and there is no evidence that it was conveyed to LaFleche before he signed the APA.  Based on the evidence in the record, Garland only conveyed this representation to McGivern - and, furthermore, only did so after the sale was

33

decided; thus, LaFleche could not have reasonably relied this representation in deciding whether to enter into the APA.

The Court concludes that LaFleche's misrepresentation claim must be dismissed in its entirety.

### F.    Equitable Remedies

The APA states:

**<u>COVENANT NOT TO COMPETE</u>**

> As a substantial inducement to CLARK to enter into and to perform its obligations under this AGREEMENT, MR. LA FLECHE shall execute and deliver to CLARK an Employment Agreement in the form of the attached <u>Exhibit C</u> at Closing.

(APA ¶ 11.)

Clark notes that LaFleche's Complaint seeks an order "declaring the non-compete and non-solicitation provision in his employment agreement to be unenforceable." (Compl. at 7 ¶ 2.) Clark asserts that the causes of action pled by LaFleche do not allow for such a declaration. Even if the APA was breached, the only available remedies would be those provided for in the APA and any compensatory relief. It claims that the Employment Agreement is separate and distinct from the APA and is not at issue in this lawsuit. Furthermore, LaFleche asserts no claim for declaratory judgment.

LaFleche notes that he is currently employed by Clark. He claims that his Employment Agreement is incorporated into the APA. The Employment

Agreement provides for a twelve-month non-compete period following the termination of his employment.  He asserts that he has not brought a motion to render the non-compete unenforceable and he has not sought employment at a Clark competitor.  Thus, he states that Clark's motion for summary judgment on this issue is premature.  LaFleche states that, if his employment at Clark ceases, he reserves the right to later bring a motion setting forth the reasons that the non-compete is unenforceable.

LaFleche cannot avoid summary judgment on this issue by claiming that he may bring a motion based on this issue at a later date.  He specifically sought in his Complaint to have the Court declare the non-compete and non-solicitation provision of his Employment Agreement to be unenforceable.  "[I]n opposing a motion for summary judgment, a nonmoving party may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial." Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003) (citation omitted).  In response to Clark's motion for complete summary judgment in this matter, it is LaFleche's responsibility to point to some issue of material fact on this claim.  It is not sufficient for him to attempt to reserve the right to assert this claim later.

LaFleche argues in the alternative that the non-compete is unenforceable because Clark already materially breached the APA and Clark falsely induced

35

LaFleche into entering the Employment Agreement, so it is barred in equity from enforcing it.  The Court has already granted summary judgment to Clark on LaFleche's fraudulent inducement claim.  Portions of LaFleche's claim that Clark breached the APA have survived summary judgment.  However, LaFleche has failed to designate specific facts showing that there is a genuine issue for trial on this issue, particular in light of the severability clauses contained in both the Employment Agreement and APA.

**G.    LaFleche's Claim for Attorney Fees**

Finally, Clark argues that LaFleche cannot be awarded attorney fees because the recovery of attorney fees must be based on either statute or contract. Schwickert, Inc. v. Winnebago Seniors, Ltd., 680 N.W.2d 79, 87 (Minn. 2004) ("Recovery of attorney fees must be based on either a statute or a contract.") (citation omitted).  The APA is silent as to attorney fees and LaFleche has not cited to any statute that would award him fees if his is successful at trial.

LaFleche asserts that Clark's request to strike his attorney fees claim is premature because LaFleche has not brought such a motion and may never bring one.  He claims that requests for attorney fees are usually addressed after the merits of the case have been resolved, so he asks that the Court not rule on the issue of attorney fees until the parties submit briefs on the issue.

Clark has adequately shown that there is no basis for an attorney fee award

36

and LaFleche has pointed to no basis in law for such a recovery or to any issue of material fact that would affect his ability to recover fees, so dismissal of his attorney fees claim is appropriate.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 28] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Count II and Count III are **DISMISSED WITH PREJUDICE**.

2.    Count I **REMAINS** to the extent explained in the body of this Memorandum of Law & Order.


Dated: July 9, 2007                              s / Michael J. Davis
                                                 Judge Michael J. Davis
                                                 United States District Court

37